COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Humphreys and Alston
Argued at Salem, Virginia


RONALD JEROME JONES

                                                                    OPINION BY
v.        Record No. 2721-07-3                        JUDGE ROSSIE D. ALSTON, JR.
                                                                    MAY 26, 2009
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                              John J. McGrath, Jr., Judge

            Sheila R. Keesee (Bruce D. Albertson; The Law Offices of Bruce D.
            Albertson, on brief), for appellant.

            Eugene Murphy, Senior Assistant Attorney General (Robert F.
            McDonnell, Attorney General, on brief), for appellee.


        Ronald Jerome Jones (appellant) was convicted of second-degree murder, in violation of

Code § 18.2-32.  On appeal, he contends that the trial court abused its discretion by allowing an

expert witness, whose opinion was based on neither her personal knowledge nor on facts in

evidence, to testify as to the victim's cause of death.  For the reasons that follow, we hold that

the trial court did not err in its finding that the opinion expressed by the expert witness was based

sufficiently upon the witness' own observations and analyses.  Therefore, we affirm appellant's

conviction.

                                    I.  BACKGROUND

        "On appeal, we construe the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom."  Zoretic v. Commonwealth,

13 Va. App. 241, 242, 409 S.E.2d 832, 833 (1991) (citing Higginbotham v. Commonwealth, 216

Va. 349, 352, 218 S.E.2d 534, 537 (1975)).  Viewed by that standard, the evidence demonstrates

that on August 19, 1983, Sharon Johnson was dating appellant, and lived with him in a room at the Campbell Hotel in Harrisonburg. Phillip Pope also lived at the Campbell Hotel, and he often socialized with appellant and Johnson.

On the evening of August 19, 1983, appellant and Pope traveled on foot to the C & E Diner to purchase a six-pack of beer. On the way to the diner, appellant twisted his ankle. The pair returned to the Campbell Hotel at about 7:00 p.m., where they drank the beer they had purchased. At about 10:00 p.m., appellant asked Pope to borrow five dollars from Pope's father to pay for a cab to take appellant to the hospital. Pope returned approximately one hour later, and gave the money to appellant.

Appellant called a cab, but when it arrived at about midnight, appellant could not find the money. Appellant told the cab driver to leave, because appellant did not have money for the fare. Appellant returned to the hotel room that he shared with Johnson. There, he blamed Johnson for the loss of the money, and the couple began to argue. Even after the money was found, appellant and Johnson continued their dispute. Eventually, the verbal altercation became physical. Pope saw appellant strike Johnson five or six times on her face and head with an open hand and five or six times with a closed fist. Johnson did not defend herself or fight back. When Johnson's head slumped forward, appellant said, "It's time to go to sleep, bitch." Then, appellant struck Johnson in the back with his elbow, causing her to drop to the ground. Appellant proceeded to kick Johnson with force in the face, head, and upper body as many as ten times. During the assault, Johnson attempted to crawl away and begged Pope, who stood in the doorway of the hotel room, to help her.

Pope ran from the room and told Penny Martinez, who was sitting on the hotel's porch, that appellant was beating Johnson. He asked Martinez to help Johnson and returned to the vicinity of appellant's hotel room. Appellant was looking out the window, and upon seeing

Pope, asked him why he was "telling [his] business" and chased Pope away with a knife. Pope ran to a nearby convenience store and asked the clerk to call for emergency assistance.

As Martinez was headed down the fire escape of the hotel to get help, she saw appellant slapping Johnson with an open hand and pulling Johnson by the arm to prevent her from leaving the room. Martinez looked away, and when she looked back, Johnson was lying on the ground. At this point, appellant was kicking Johnson in the head, with an amount of force comparable to how "you would kick . . . a football." Then, appellant approached Martinez, grabbed her arm, and told her "not to do anything because if [she] did [she] would regret it." The last time Martinez saw Johnson, Johnson had blood coming out of her ears and was begging appellant to stop beating her.

At about 7:00 a.m. the following day, paramedics arrived at the room shared by Johnson and appellant. Johnson was taken to the hospital. Karen Thomas, Johnson's sister, testified that she saw Johnson at the University of Virginia Hospital on August 20, 1983. Thomas further testified that Johnson, who was in a coma, was nearly unrecognizable given the degree of swelling and bruising on her face. Johnson died on August 27, 1983.

Dr. Marcella Fierro, who at the time of the trial was the Deputy Chief Medical Examiner for the Central District of Virginia, qualified as an expert forensic pathologist in the August 2007 trial.[1] She offered her opinion regarding Johnson's cause of death. During direct examination, Dr. Fierro stated that her opinion was based upon her personal examination of Johnson's body during the autopsy. Dr. Fierro stated that Johnson had two blackened eyes, which were indicative of a head injury. Additionally, a contusion of five inches by six inches on Johnson's skull and a three-inch by three-inch bruise on Johnson's scalp near the larger contusion also

---

[1] Although an initial suspect in the matter, it bears noting that twenty-four years passed between Johnson's death and the 2007 trial of appellant. Appellant was arrested in March 2007 in Greensboro, North Carolina, where he was living under an assumed name.

indicated an acute head injury.  The autopsy revealed Johnson had subdural and epidural hematomas, as well as actual bruises on the brain.  Finally, Johnson suffered from a blood clot that caused her brain to shift in her skull, causing necrosis or cell death in the brain structures that control respiration.  Dr. Fierro testified that the necrosis was sufficient to cause "profound coma" or death.

Dr. Fierro testified that Johnson's death had resulted specifically from bronchial pneumonia or aspiration pneumonia, which developed as a complication of the head injury.  The damage to Johnson's brain damaged her gag reflex, which allowed secretions to accumulate in her airway.  These secretions, combined with her impaired breathing, created physical conditions in which the pneumonia developed.  Dr. Fierro testified, "The injury that set this whole lethal train of events in motion was the injury to her head.  She would have no pneumonia without the head injury."

Dr. Fierro also testified that Johnson had four contusions on her back and marks on her neck, which suggested that she had been manually choked.  Dr. Fierro found no defensive wounds on Johnson's body.  Dr. Fierro did note that Johnson's body showed additional marks, which she described as "injuries that occurred after hospitalization," caused when the hospital staff treated her.  Dr. Fierro stated that Johnson had an incision on her chest where a tube had been inserted to drain pus from her chest.  Dr. Fierro also identified indications that Johnson had undergone brain surgery.  She pointed to the operative site and showed "where the doctors went in and did surgery and the tissue bled."  Dr. Fierro further indicated the location of a pressure screw in Johnson's skull, and stated that its presence indicated Johnson's brain was swollen.  Dr. Fierro testified that none of the injuries to Johnson's brain were suggestive of an epileptic seizure, as alleged by appellant.

Throughout the direct examination of Dr. Fierro, appellant objected to her testimony on the grounds that a proper foundation had not been laid, alleging that her testimony was not based on facts in evidence or elicited in response to a hypothetical question. On cross-examination, Dr. Fierro admitted that in conducting the autopsy, she relied, in part, on University of Virginia medical records that were not admitted into evidence. Specifically, Dr. Fierro stated that she had relied on the medical records during the autopsy to determine the time that Johnson arrived at the hospital, as well as her condition at her time of arrival. However, Dr. Fierro stated that she could have determined Johnson's cause of death by relying solely on facts in evidence. She stated, "If I saw this lady without any record whatsoever I would know she was a beating." Further, based on her personal observations, both with the naked eye and under the microscope, Dr. Fierro testified that she was able to determine Johnson's brain was necrotic prior to her death and that Johnson developed pneumonia due to the brain injury.

Dr. Fierro stated that she could determine approximately when the pneumonia developed without the aid of the medical records not in evidence. She explained that an examination of the lung cells revealed that the lung injury was "not older than days," for there were no chronic inflammatory cells, which would have been present had the pneumonia been older than seven days. During cross-examination, Dr. Fierro stated that she would have said the pneumonia was several days old based on a microscopic examination of the cells alone; however, she did admit to having access to the medical record, which gave her the same information.

After the Commonwealth presented its evidence to the jury, appellant moved to strike Dr. Fierro's testimony on the ground that she relied on facts not in evidence in reaching her opinion as to the cause of Johnson's death. The trial court overruled the motion. At the conclusion of the evidence, appellant renewed his motion to strike. The trial court overruled the

motion to strike the evidence, and the matter was submitted to the jury. The jury convicted appellant of second-degree murder.

This appeal followed.

## II. ANALYSIS

On appeal, appellant contends the trial court abused its discretion by allowing Dr. Fierro's opinion testimony. To support that contention, appellant claims Dr. Fierro rendered her opinion without personal knowledge and also relied upon facts not introduced into evidence. We disagree and find that the trial court did not abuse its discretion.

"A court's admission of expert testimony is a matter committed to the sound discretion of the trial judge, and we generally will disturb a decision of this nature only when the court has abused its discretion." Commonwealth v. Miller, 273 Va. 540, 549, 643 S.E.2d 208, 213 (2007) (citing Atkins v. Commonwealth, 272 Va. 144, 153, 631 S.E.2d 93, 97 (2006); Tarmac Mid-Atlantic, Inc. v. Smiley Block Co., 250 Va. 161, 166, 458 S.E.2d 462, 465 (1995)). In Virginia criminal cases, an "'expert may give an opinion based upon his own knowledge of facts disclosed in his testimony or he may give an opinion based upon facts in evidence assumed in a hypothetical question.'" Simpson v. Commonwealth, 227 Va. 557, 565, 318 S.E.2d 386, 391 (1984) (quoting Walrod v. Matthews, 210 Va. 382, 388, 171 S.E.2d 180, 185 (1969)). See also Virginia Ry. Co. v. Andrews, 118 Va. 482, 489-90, 87 S.E. 577, 580 (1916). "Generally, an expert witness in Virginia has not been permitted to base his opinion on facts not in evidence." Simpson, 227 Va. at 565, 318 S.E.2d at 391 (citing Ortiz v. Barrett, 222 Va. 118, 130, 278 S.E.2d 833, 839 (1981); Meade v. Belcher, 212 Va. 796, 801, 188 S.E.2d 211, 214 (1972)).

Our Supreme Court has previously considered the admissibility of expert opinions in criminal cases in Simpson.[2] In that case, the Commonwealth offered an assistant medical examiner's opinion testimony as to the victim's cause of death. Id. at 565, 318 S.E.2d at 391. Over Simpson's objection, the trial court permitted the testimony even though the medical examiner partially relied upon hospital records not admitted into evidence. Id. On appeal, the Court affirmed the trial court's judgment. Id. at 568, 318 S.E.2d at 393. In doing so, the Court found evidence in the record that independently supported the medical examiner's opinion without the medical examiner making reference to the hospital records. Id. at 566, 318 S.E.2d at 392. Specifically, the Court considered the medical examiner's personal observations of the victim's body during the autopsy, the medical examiner's experience and training, and the exhibits in evidence as sufficient bases for his opinion that the defendant's assault of the victim caused the victim's death. Id. Thus, the Court concluded that the record contained "sufficient factual basis for the admission of [the medical examiner's] opinion without reference to the hospital records." Id. at 566, 318 S.E.2d at 391-92.

---

[2] In that case, the Virginia Supreme Court explicitly rejected expanding the ability of expert witnesses to testify to facts not admitted into evidence:

> The Commonwealth, however, urges us to adopt, in substance, the view of the Federal Rules of Evidence, which would permit an expert to base his opinion on facts made known or perceived by him at or before trial, whether admissible in themselves or not, provided they are facts of a type normally relied on by other experts in the field. See Fed. R. Evid. 703 and 705.
>
> We are unwilling to accept this invitation. The General Assembly, in 1982, enacted Code § 8.01-401.1 which essentially adopts the foregoing provisions of the Federal Rules of Evidence. That statute's application is expressly limited to any civil action. We regard this limitation as a clear expression of legislative intent to retain the historic restrictions upon expert testimony in criminal cases in Virginia.

Simpson, 227 Va. at 566, 318 S.E.2d at 391.

The analysis in Simpson applies herein. Critical to the Court's determination herein are the particular facts presented in the trial court. In this case, the evidence established that Dr. Fierro conducted an autopsy on Johnson's body shortly after her death. Based on her personal examination of Johnson's body, she was able to determine that Johnson had suffered an acute head injury that severely damaged the structures in her brain that regulated respiration and the gag reflex. This opinion was based both on her examination of the brain with her naked eye, as well as an examination of brain cells under a microscope. Dr. Fierro concluded that Johnson's death resulted from pneumonia, an opinion supported by her examination of Johnson's lung cells, which revealed the presence of the pneumonia, as well the age of the pneumonia. Dr. Fierro's training and experience supported the conclusion that the pneumonia was caused by the head injury. Thus, notwithstanding Dr. Fierro's familiarity with the medical records that were not admitted into evidence, Dr. Fierro's expert opinion contained a sufficient factual basis for the admission of her opinion without reference to the hospital records.

To be clear, our conclusion in this case follows the rule articulated in Simpson, that is, an expert witness in a criminal trial may only testify to those facts within his personal knowledge and may not be permitted to base his opinion on facts not in evidence. Had Dr. Fierro's personal observations during the autopsy not constituted a sufficient basis for her to render an opinion as to the cause of Johnson's death, Dr. Fierro's testimony would not have been admissible. Essentially, the personal observations Dr. Fierro obtained during the autopsy cured any alleged inappropriate evidentiary considerations and overcame any suggestion that she partially relied upon hospital records not admitted into evidence.

The record shows that Dr. Fierro's opinions were supported by her own observations and examinations of Johnson's body that were entirely unrelated to the medical records. Indeed, Dr. Fierro had sufficient personal knowledge, experience, and training to support her expert

- 8 -

opinion that Johnson's death resulted from the pneumonia, which was directly related to her head injury.  Accordingly, we cannot say the trial court abused its discretion in allowing Dr. Fierro's opinion testimony as to the cause of Johnson's death.

## III.  CONCLUSION

For these reasons, we affirm appellant's conviction.

<u>Affirmed.</u>